UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __9/7/21__

---

Felix Parrilla,

                        Petitioner,

            —v—

United States of America,

                        Respondent.

19-cv-9275 (AJN)
13-cr-360 (AJN)

---

Gary Thomas,

                        Petitioner,

            —v—

L & Leung Leather Ltd. Et al.,

                        Respondent.

19-cv-9756 (AJN)
13-cr-360 (AJN)

---

Kirk Tang Yuk,

                        Petitioner,

            —v—

L & Leung Leather Ltd. Et al.,

                        Respondent.

19-cv-9416 (AJN)
13-cr-360 (AJN)

OPINION & ORDER

---

ALISON J. NATHAN, District Judge:

On July 17, 2014, following a nine-day jury trial that began on July 7, 2014, Felix

Parrilla, Gary Thomas, and Kirk Tang Yuk were convicted by a jury of conspiring to distribute

1

and possess with the intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). The Second Circuit subsequently affirmed their convictions. Each now brings a motion for a writ of habeas corpus under 28 U.S.C. § 2255, arguing that their sentences were imposed in violation of the Constitution. For the reasons that follow, the Court DENIES each Petitioner's motion.

## I.    Background

A.  Factual background

At trial, the Government presented evidence in the form of witness testimony, phone records, recordings of wiretap interceptions, consensual recordings made by the cooperating witness at the direction of the Government, text messages, a video recording, GPS locational data, and physical evidence collected during the course of the Government's investigation. Together, the Government argued, the evidence proved the following conspiracy.

Deryck Jackson, the Government's cooperating witness, met Defendant Gary Thomas in the summer of 2010. Tr. 633.[1] Thomas owned a legitimate waste management business in St. Croix, U.S. Virgin Islands, named Paradise Waste Systems, Inc. Tr. 634. Thomas subsequently introduced Jackson to Defendant Felix Parrilla, whom Jackson knew as Lito, and to Defendant Kirk Tang Yuk. Tr. 634–35. Jackson began doing odd work here and there for Thomas in the early part of 2012, Tr. 635–36, but in the summer of 2012, Thomas asked Jackson if he wanted to make some extra money by helping Thomas distribute cocaine, Tr. 636–37. After Jackson agreed, he traveled from Florida to St. Croix on several occasions to discuss the possible drug transaction. Tr. 637.

---

[1] Except where noted, references to Docket Entries refer to the criminal docket, No. 13-cr-360 (S.D.N.Y).

On one of these trips to St. Croix, Thomas explained to Jackson that Parrilla would take some of the cocaine after it was delivered in Florida.  Tr. 644–45.  Sometime later, Jackson met with Tang Yuk in Florida and told Tang Yuk that he was expecting to receive some cocaine; he then asked Tang Yuk whether he wanted to sell some of it, Tr. 647–64, and Tang Yuk agreed, Tr. 650.

At some point, Jackson purchased a number of pre-paid cell phones, which were referred to as "go phones," that he used to communicate with Thomas and Parrilla any time they discussed the drug transaction.  Tr. 650–51, 691.  Jackson programmed the phones and gave two of them to Thomas, who in turn provided one of the phones to Parrilla.  Tr. 651.  (Thomas activated his phone on September 13, 2012.  Tr. 1832.  Parrilla activated his prepaid phone on September 19, 2012, which is the same day that Jackson testified that he picked up the cocaine in Florida from Parrilla's shop, Tr. 749–50, 764, 1834–35.)

On August 29, 2012, Thomas emailed the Tropical Shipping Company to request a 20–yard container to be delivered to Paradise Waste, which would be used to convey a tire shipment headed to the U.S. mainland.  Tr. 1366–67.  Geolocation data from Jackson's phone showed that Thomas and Jackson met at Paradise Waste on August 31, 2012.  Tr. 1368.  Jackson testified that on that day he and Thomas packed 80 kilograms of cocaine into the false bottom of a wooden shipping crate, Tr. 697–98, 700–701, and that Thomas poured a chemical with a pungent odor into the crate to mask the smell of the drugs, Tr. 701–02.  While at Paradise Waste, Thomas told Jackson that he would pick up the crate from a man named "Angel" when it arrived at a business near Medley, Florida.  Tr. 704–05.

On September 19, 2012, Thomas used his go phone to call Jackson to tell him to pick up the shipment of cocaine at a company called BJ Retreaders.  Tr. 745–46.  Jackson rented a U-

Haul truck to move the crates and also bought moving boxes and duct tape to store the cocaine.
Tr. 1833.  After collecting the cocaine from BJ Retreaders, Jackson drove the crates to a garage
where he unloaded the cocaine and distributed it into the four U-Haul boxes that he had bought,
along with rice and dryer sheets to mask the scent of the drugs, and then used plastic shrink-wrap
and duct tape to seal the boxes.  Tr. 753–54.  After Jackson delivered the non-contraband
contents of the crate, Thomas contacted Jackson on his go phone and directed Jackson to go to
Parrilla's shop in Fort Lauderdale, Florida.  Tr. 758.  Jackson and Parrilla then exchanged calls
around 3:00 that afternoon.  Tr. 758–59.  On one of those wiretapped conversations, Jackson
informed Parrilla that, "I was dropping off the things for him.  His parts, I, I'm secure already,
and I told him I'm waiting to hear from you."  Tr. 761.

Jackson arrived at Parrilla's shop around 4:00 p.m. and confirmed that he had picked up
the cocaine.  Tr. 765.  Parrilla told Jackson to deliver 53 kilograms of cocaine to him and to take
the remaining 27 kilograms on consignment at a price of $26,000 per kilogram.  Tr. 765.  At 5:13
p.m., Jackson asked Tang Yuk to come by his apartment.  Tr. 769–71.  Outside of his apartment,
Jackson gave Tang Yuk two kilograms of cocaine on consignment at a price of $27,000 per
kilogram.  Tr. 711–72.  Tang Yuk and Jackson then exchanged a number of calls in which they
discussed selling the two kilograms of cocaine.  Tr. 778–80, 783–84, 788–89, 791.

On the evening of September 20, 2012, Jackson delivered 53 kilograms of cocaine to
Parrilla at his shop.  Tr. 772.  The cocaine was packed in two of the U-Haul boxes that Jackson
had purchased, Tr. 776, and contained rice and dryer sheets, Tr. 777–78.

Jackson then rented a car at Miami International Airport and drove to New York City
with his wife, Lizette Velazquez, and the remaining 25 kilograms of cocaine.  Tr. 791–92.  On
September 22, 2012, Jackson traversed the Verrazano–Narrows Bridge and checked into a hotel

4

in Queens.  Tr. 499, 794–795.  DEA agents then arrested Jackson, Velazquez, and an associate named Fred Fulton, and also seized the 25 kilograms of cocaine.  Tr. 795, 810–11.  Jackson began cooperating with the Government shortly after his arrest.

On September 28, 2012, law enforcement searched Parrilla's shop pursuant to a search warrant and found U-Haul boxes, rice, dryer sheets, and shrink-wrap.  Tr. 1386–87, 775–76.  Law enforcement did not recover any narcotics from this search.  During the search, Parrilla slowly drove by the shop and sped off shortly thereafter.  Tr. 1393–95.  He returned about 45 minutes later and consented to a search that revealed that he was carrying $17,000 in cash.  Tr. 1393–99.  The Government introduced phone records from the night that Parrilla's shop was searched showing a flurry of phone calls between Parrilla, Thomas, and Tang Yuk.

On a call between Thomas and Jackson following the search, Thomas informed Jackson that the search of Parrilla's shop had caused him to "start f* * *ing panicking" and that he "couldn't sleep all night."  Tr. 1846.  Thomas also informed Jackson that Parrilla had sold the 53 kilograms of cocaine in a matter of days, Tr. 1308, and had paid Thomas for his role in the conspiracy, Tr. 856.  On October 3, 2012, Tang Yuk delivered to Jackson's wife in Florida a backpack containing $25,000 in drug proceeds from the cocaine that he sold.  Tr. 854–55, 1965.

Following Jackson's arrest, Thomas, Parrilla, and Tang Yuk expressed concern regarding the status of the 25 kilograms that were in his possession.  For example, on October 12, 2012, Thomas sent two text messages to Jackson stating "call me now" and "you need to deal with my son now its about to get ugly give him what you have."  Tr. 860–61.  During a separate call in February 2013, Parrilla and Tang Yuk discussed what might have happened to Jackson.  Tr. 1568–69.  The Government had removed Jackson's name from the Bureau of Prisons' online database to ensure that his arrest would not be made public.  Tr. 215.  Parrilla noted on the call

that if Jackson had been arrested, he "would have shown up" on the "BOP" website. Tr. 232–33. This led Parrilla to speculate that Jackson "ate the f* * *ing food," Tr. 1858, which was code for cocaine, Tr. 649, 781, suggesting that Parrilla was concerned that Jackson had absconded with the drugs.

On June 5, 2013, Parrilla, Tang Yuk, and Thomas were arrested in connection with this case. Tr. 221.

B. Procedural history

The Superseding Indictment filed June 19, 2014, charged Parrilla, Tang Yuk, and Thomas in one count with conspiring to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). Dkt. No. 148. After a nine-day trial, the jury convicted all three Defendants on Count One. Tr. 2076–78. Defendants filed motions challenging the sufficiency of the Government's evidence, which this Court denied. *United States v. Parrilla*, No. 13-CR-360 AJN, 2014 WL 7496319 (S.D.N.Y. Dec. 23, 2014). This Court then sentenced, in separate proceedings, each Defendant to the following terms of imprisonment: Parrilla to 300 months, Thomas to 216 months, and Tang Yuk to 151 months. Dkt Nos. 283, 285, 286.

In January 2015, Defendants timely appealed their convictions. Dkt. Nos. 290, 291, 297. On appeal, each argued that venue did not properly lie in the Southern District of New York. *United States v. Tang Yuk*, 885 F.3d 57, 68–70 (2d Cir. 2018). They raised additional issues related to witness testimony, evidentiary objections, sufficiency of the evidence to convict, the Government's discovery obligations, and calculation of their sentences. *Id.* at 68. The Second Circuit rejected each claim on appeal and affirmed Defendants' sentences. *Id.* at 90. As to venue, the court concluded that there was "undoubtedly sufficient" evidence that co-conspirator Jackson committed an overt act by driving the cocaine across the Verrazano–Narrows Bridge in

the Southern District of New York and, further, that "the jury was entitled to conclude that it was reasonably foreseeable to Thomas, Tang Yuk, and Parrilla that an overt act in furtherance of the conspiracy would be taken in the Southern District of New York." *Id.* at 71–72. Defendants sought a writ of certiorari from the Supreme Court, which was denied on October 9, 2018. *Tang Yuk v. United States*, 139 S. Ct. 342 (2018).

In October 2019, Parrilla, Tang Yuk, and Thomas each filed a motion to vacate their sentences under 28 U.S.C. § 2255. Parrilla Petition, Dkt. No. 318; Tang Yuk Petition, Dkt. No. 319; Thomas Petition, Dkt. No. 323. The Government filed a single consolidated response to Petitioners' motions on January 13, 2020. Gov't Br., Dkt. No. 327; *see also* Dkt. No. 326 (granting the Government permission to file one response). Petitioners each filed a reply. Tang Yuk Reply Br., Dkt. No. 337; Thomas Reply Br., 1:19-CV-09756, Dkt. No. 43; Parrilla Reply Br., 1:19-CV-09275, Dkt. No. 19. Thomas requested production of materials from his trial counsel, which were satisfied. *See* Dkt. Nos. 332, 334, 339, 342, 343, 345, 353, 355, 359. He also requested discovery from the Government. *See* Dkt. No. 336. The Court denied Thomas's discovery request, Dkt. Nos. 343, 378, but issued orders to ensure that Thomas could review his trial counsel's records, Dkt. Nos. 362, 369, 378. Thomas filed additional briefing after his reply, Thomas Suppl. Reply Br., Dkt. No. 392; to which the Government filed a sur-reply, Gov't Sur-Reply Br., Dkt. No. 397. Thomas filed his final reply brief on April 14, 2021. Thomas Second Sur-Reply Br., Dkt. No. 401.

In total, Petitioners raise approximately nineteen grounds for relief, several of which partially or fully overlap.

## II.    Legal Standard

All Petitioners' grounds for relief rest on a claim that Petitioners received ineffective assistance of counsel at their trial.[2]  The Sixth Amendment entitles criminal defendants to effective assistance from an attorney at critical stages of their case, including guilty pleas and sentencing.  *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013).  To make an ineffective assistance of counsel claim, "a defendant must show: (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *United States v. Brown*, 623 F.3d 104, 112 (2d Cir. 2010) (internal quotation marks omitted); *see Strickland v. Washington*, 466 U.S. 668, 688 (1984).  That is, Petitioners must show that "[t]he likelihood of a different result [was] substantial, not just conceivable."  *Harrington v. Richter*, 562 U.S. 86, 112 (2011).  These two requirements are the reasonableness and prejudice prongs respectively.

In evaluating the reasonableness of counsel's representation, the Court is "mindful of the diversity of the bar and the variety of approaches effective attorneys might employ when dealing with a particular set of facts." *Parisi v. United States*, 529 F.3d 134, 141 (2d Cir. 2008).  As a result, the Court is "highly deferential" and applies a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.  The Court will also consider "the circumstances counsel faced at the time of the relevant conduct and evaluate the conduct from counsel's point of view." *Parisi*, 529 F.3d at 141 (cleaned up). "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and even strategic choices made after less than complete

---

[2] With the exception of Thomas's prosecutorial-misconduct claim raised in his second reply brief, *infra*.

investigation do not amount to ineffective assistance—so long as the known facts made it reasonable to believe that further investigation was unnecessary." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (cleaned up).

Simple disagreement with counsel's chosen strategy, especially with the benefit of hindsight, is insufficient to support an ineffective assistance of counsel claim. *See United States v. Sanchez*, 790 F.2d 245, 253 (2d Cir. 1986) ("A defendant . . . may not claim ineffective assistance of counsel merely because in hindsight he thinks counsel's trial strategy was inadequate."). Generally, courts do not second guess trial counsel's "determinations regarding the defense strategy adopted at trial." *Pignard v. United States*, No. 06 CR 718 CM, 2010 WL 5396085, at *7 (S.D.N.Y. Dec. 22, 2010). Typically encompassed within the ambit of trial counsel's strategic discretion is "whether to call any witnesses on behalf of the defendant, and if so which witnesses to call." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); *see United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002) ("A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel."). So too "[d]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature." *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992) (citation omitted). Last, "the failure to make a meritless argument does not rise to the level of ineffective assistance." *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995).

## III.    Analysis

The Court first addresses Petitioners' shared claims regarding venue in the Southern District of New York and regarding the Government's expert that testified to the transcripts of recorded phone calls. The Court then addresses the remaining claims raised by each Petitioner.

### A.  Challenges to venue

1. *Applicable law and facts*

The Constitution and the Federal Rules of Criminal Procedure require that the

Government "prosecute an offense in a district where the offense was committed." Fed. R. Crim.

P. 18; U.S. Const. amend. VI. "Venue may lie in more than one place if the acts constituting the

crime and the nature of the crime charged implicate more than one location." *United States v.*

*Lange*, 834 F.3d 58, 68 (2d Cir. 2016) (internal quotations omitted). When the crime charged is

a conspiracy, "any district in which an overt act in furtherance of the conspiracy was committed

is properly designated as the district where the offense was committed, so long [as] the act was

performed (1) by any conspirator, and (2) was undertaken for the purpose of accomplishing the

objectives of the conspiracy." *Tang Yuk*, 885 F.3d at 69 (cleaned up).

This Court concluded that the evidence introduced at trial was sufficient for a jury to

conclude that one of Petitioners' co-conspirators, Jackson, committed such an act within the

Southern District of New York. *Parrilla*, 2014 WL 7496319, at *11. In its instructions, the

Court informed the jury that (1) the Southern District includes the Verrazano–Narrows Bridge,

(2) that any act in furtherance of the crime committed by a co-conspirator in the Southern

District satisfies venue so long as it was "reasonably foreseeable" to the Defendant, (3) that a

single call or text message made from the Southern District to a defendant outside the Southern

district is such an act, and (4) that the Government need prove venue only by a preponderance of

the evidence. *Id.* (quoting Tr. 2044–45). Defense counsel raised numerous objections to these

instructions both before and during trial, and the Court made "substantial revisions" to the

instructions in response. *Id.* at *10–11.

As to Thomas, the Court pointed to several pieces of evidence that established venue.

First, Jackson called Thomas from New York and told him "I'm up in New York," at the

instruction of federal agents.  *Id.* at *14 (quoting Tr. 1299).  Thomas, knowing this information, later threatened Jackson for the money owed for the cocaine.  *Parrilla*, 2014 WL 7496319, at *14.  Second, apart from the phone call, the Government introduced evidence that Jackson had previously sold cocaine in New York, in part because the price there was higher than in Florida. *Id.*; Tr. 212, 945–48.  That evidence permitted the jury to infer that Jackson's co-conspirators could reasonably foresee that Jackson would sell the cocaine in New York.  *Parrilla*, 2014 WL 7496319, at *14.

Similar evidence established venue as to Tang Yuk.  In a September 2012 call, Jackson told Tang Yuk that he was "out of town."  *Id.* at *15 (quoting Tr. 1295).  The next month, Jackson told Tang Yuk he was "up here in New York."  *Id.* (quoting Tr. 1298).  Rather than respond with surprise, Tang Yuk told Jackson, "Do your thing, man. It ain't nothing."  *Id.*  Tang Yuk was also aware of the same information that made New York a reasonably foreseeable target of Jackson's cocaine sales.  *Id.*  Parrilla's counsel did not object to venue at this stage and so this Court did not address it.

The Second Circuit affirmed on appeal, holding that the Court's jury instruction was proper, *Tang Yuk*, 885 F.3d at 71, and that there was sufficient evidence of venue as to all three Defendants, *id.* at 72–76.  Parrilla challenged venue for the first time on appeal, which subjected his challenge to plain error review.  *Id.* at 75.  The Court concluded that while there was no similar call between Jackson and Parrilla, a jury could reasonably conclude that Thomas informed Parrilla of Jackson's whereabouts given that Parrilla was "the leader of the conspiracy."  *Id.* at 76.

After this exhaustive consideration of the issue, Petitioners raise several challenges to proof of venue in the form of ineffective assistance of counsel claims.  The Court concludes that,

especially in light of the Second Circuit's binding decision on this issue, none of Petitioners' claims justify relief. *See United States v. Corley*, No. 13-CR-48 (AJN), 2020 WL 4676650, at *10 (S.D.N.Y. Aug. 11, 2020) ("Since the merits of these arguments were effectively adjudicated on appeal, repackaging them as ineffective assistance claims cannot circumvent the mandate rule or entitle petitioner to habeas relief." (cleaned up)).

　　2.　*Parrilla's counsel's failure to object to venue*

Parrilla contends that trial counsel was ineffective because "[d]espite clear evidence that venue was manufactured and improper," his counsel did not object to it, resulting in plain error review on appeal rather than the de novo standard his two codefendants received. Parrilla Petition at 6. He emphasizes that one judge dissented in the Second Circuit's opinion, making this a close legal question. *Id.*

Parrilla's claim fails to satisfy either *Strickland* prong. As an initial matter, Parrilla does not identify what objection he would like his counsel to have made at trial. To the extent his counsel had argued that venue was "manufactured" or otherwise unlawful, Parrilla Petition at 6, that objection was made by Parrilla's codefendants and failed on appeal. Counsel's decision to not object to venue was a reasonable strategic choice that this Court does not second-guess. *See Sanchez*, 790 F.3d at 253. That is especially so because venue was the only element charged that the Government did not have to establish beyond a reasonable doubt. It was not, as Parrilla suggests, his "best opportunity for victory." Parrilla Reply at 3.

Nor was Parrilla prejudiced by the lack of a venue objection. Though the Second Circuit recited the standard for plain error review, the court rejected Parrilla's venue challenge because there was sufficient evidence to permit a jury to infer that Parrilla was aware that Jackson was in New York. *Tang Yuk*, 885 F.3d at 76. That holding would be the same regardless of the

12

standard of review applied. Notably, even the dissent did not suggest that Parrilla had any challenge to venue distinct from his codefendants who did object. *Id.* at 94 (Chin, J., dissenting). Further, objecting to venue as "manufactured" would not have altered the Second Circuit's rejection of identical arguments made on appeal by codefendants' counsel. In sum, there is no "reasonable probability" of a different result if Parrilla's counsel had objected to venue.

    3. *Agent Giraldo's testimony on venue*

       Tang Yuk argues that his counsel was ineffective because he failed to object to a Government witness's testimony that intruded on the jury's consideration of venue. Tang Yuk Br. at 2–7. Specifically, Tang Yuk points to the testimony of Special Agent Carlos Giraldo, who testified that Jackson drove the cocaine over the Verrazano–Narrows Bridge, which, Giraldo said, is "[p]art of the Southern District of New York." *Id.* at 3 (quoting Tr. 265–66). Similar testimony was repeated several times. *E.g.*, Tr. 268, 333. Tang Yuk contends that the statement was "improper" because it "violated the province of the jury." Tang Yuk Reply Br. at 3.

       Neither *Strickland* prong is satisfied. First, Tang Yuk does not show that defense counsel acted unreasonably. In fact, counsel raised exactly these arguments in repeated objections, which the Court overruled. Tr. 267 (objection), 333–41 (objection and sidebar). Those objections prompted the Court to give a curing instruction the next day, stating that, to the extent a witness's testimony was based on hearsay, the jury should disregard it. Tr. 402. That defense counsel did not also object to that curing instruction, or then appeal that objection, does not render counsel's efforts constitutionally ineffective. *See Ambers v. Colvin*, No. 16-CV-5326 (KAM), 2019 WL 3767036, at *7 (E.D.N.Y. Aug. 9, 2019) ("The decision to object is primarily a strategic and tactical decision and is only rarely the basis of a successful Sixth Amendment challenge."); *United States v. Plitman*, 194 F.3d 59, 63 (2d Cir. 1999).

More importantly, Tang Yuk makes no showing of prejudice.  It is an established legal fact that the Verrazano–Narrows Bridge is part of the jurisdiction of the Southern District of New York.  *E.g.*, *Tang Yuk*, 885 F.3d at 72; *United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987) (citing 28 U.S.C. § 112(b)).  It was therefore not a question for the jury to decide at all.  Rather, this Court *instructed* the jury that the Southern District of New York includes "bridges over bodies of water within the boundaries of Manhattan, the Bronx, and Brooklyn, such as the Verrazano–Narrows Bridge."  Tr. 2044.  Even if Giraldo's testimony was improper, and even if defense counsel had a duty to further object to the testimony, the testimony did nothing more than inform the jury of a fact that it was later instructed to accept as true.  There is therefore no reasonable probability of a different result had counsel acted differently.

### 4. *Thomas's challenge to proof of venue*

Thomas also claims counsel was ineffective in addressing proof of venue.  Much of his motion faults his trial counsel for focusing *too much* on venue, which he calls "no defense at all." Thomas Petition at 5a.  But he also claims that Jackson's phone call was inadequate proof of venue because, Thomas asserts, he told his counsel that "he never heard CW Jackson tell him he was in New York."  *Id.* at 5p–5p.1.  His counsel was ineffective, he continues, because counsel should have consulted with a "linguist" and "consulted with and secured the services of a forensic audio technician to clean up the audio and ascertain whether Thomas actually hea[r]d CW Jackson tell him he was in New York."  *Id.* at 5p.1; *see also* Thomas Reply Br. at 13.

This claim regarding proof of venue is unpersuasive.  Thomas does not demonstrate that his counsel acted unreasonably.  The recording of Jackson's call to Thomas was introduced as evidence and reviewed by Thomas's counsel.  And Thomas told his counsel that he had not heard Jackson say he was in New York.  Thomas's counsel therefore had adequate information

to decide whether to pursue the matter further by retaining a linguistics or forensics expert. His strategic decision not to do so, or to otherwise object to the phone call, was a strategic choice that is "virtually unchallengeable." *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004) (quoting *Strickland*, 466 U.S. at 690). Thomas's speculation that experts would have revealed information in the recording and the transcript not already apparent to the jury is inadequate to disturb the presumption that counsel acted reasonably. *See Strickland*, 466 U.S. at 689.

Prejudice is also absent for two independent reasons. First, the jury was instructed that the "recordings are evidence," not any transcripts prepared by either party. Tr. 2053. And the jury therefore "must listen to the recordings and decide what's on them." *Id.* The jury, then, was able to assess what Thomas heard in the call and come to its own conclusion. Second, even if Jackson's call to Thomas is disregarded, there is other evidence that Jackson's actions in New York were reasonably foreseeable to Thomas, not the least of which is that Tang Yuk, another co-conspirator, was also told that Jackson was in New York. *Parrilla*, 2014 WL 7496319, at *14–15. Therefore, even if the Court were to accept Thomas's assertion that counsel could have introduced evidence that persuaded a jury that Thomas had not heard Jackson's remark during the call, there would still have been sufficient evidence on the record to prove venue by a preponderance of the evidence. Consequently, the prejudice prong is not satisfied.[3]

## B. Challenges to transcripts and Lavern Bogle as a Patois expert

### 1. *Relevant background*

---

[3] In his reply, Thomas also argues that the Second Circuit erred in relying on *United States v. Rommy*, 506 F.3d 108, 122 (2d Cir. 2007), to affirm the Court's venue instruction. Thomas Reply Br. at 15–19; *Tang Yuk*, 885 F.3d at 71–75. This Court is bound by the Second Circuit's holding on this issue of law, and Thomas's claims regarding the relevance of *Rommy* are otherwise resolved by the above analysis.

The testimony of Petitioners' co-conspirator Jackson was a central piece of the Government's case at trial. The Government supplemented Jackson's testimony with recordings of calls made between Jackson and the Petitioners as well as among the Petitioners themselves. These recordings contained a mix of heavily accented English and Caribbean Patois.

The Government invited Petitioners to stipulate to the accuracy of transcripts of the recordings in advance of trial, which Petitioners declined to do. Dkt. Nos. 154, 181. The Government on June 16, 2014, provided notice to defense counsel that it intended to call a Patois expert, later identified to be Lavern Bogle, to testify to the accuracy of the Government's transcripts. Dkt. No. 181 at 11; Dkt. No. 169; Dkt. No. 165 at 1. The Government produced the transcripts in question on June 25, 2014. Dkt. No. 181 at 10. The parties failed to reach an agreement on which portions of the transcripts were to be challenged as inaccurate. *Id.* In a conference held June 25, 2014, defense counsel raised several objections to the use of the transcripts as well as to Ms. Bogle's qualifications. Dkt. No. 172. Counsel for Tang Yuk and Parrilla submitted additional letters objecting to introduction of the transcript as evidence and to Ms. Bogle's qualification as an expert under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Dkt. Nos. 169, 170.

In a July 2, 2014 order, the Court advised the parties that it would "instruct the jury that the transcripts are being admitted (assuming any are admitted) for the limited purpose of aiding the jury's understanding of what is being said on the tapes and that the jury is the ultimate fact-finder." Dkt. No. 181 at 12. The Court also stated that if the Defendants did not stipulate to the transcripts' accuracy, they should submit a letter with "specific objections they have to accuracy or audibility of the Government's draft transcripts" and should "be prepared to have their experts, if any, qualified at a hearing before" the Court. *Id.* at 13.

The Court held a *Daubert* hearing at which Ms. Bogle testified on July 7, 2014.  Tr. 5–88.

By that day—the first day of trial—Petitioners had not proposed their own expert or submitted

their own transcripts of the recordings.  Tr. 60, 84.  Defense counsel objected to Ms. Bogle's

qualifications as a witness and cross-examined her on her training as a linguist, her work

experience as a contract linguist, her familiarity with different Caribbean dialects, her methods of

transcription, and the audibility of the recordings.  Tr. 18–19, 24–56, 59–68, 79–82.

Ms. Bogle testified at trial.  Tr. 539–602.  The Court qualified her as an expert witness

and provided a limiting instruction to the jury.  Tr. 551–52; *see also* Tr. 82–86.  Defense counsel

again subjected Ms. Bogle to extensive cross-examination.  Tr. 557–600.  In summation, counsel

for Parrilla reminded the jury of this cross-examination, stating that "Ms. Bogle did not have the

qualifications that she indicated she had."  Tr. 1908–09.  Counsel encouraged the jury to "just

put the transcripts down and listen to the tapes."  Tr. 1908.

Finally, the Court instructed the jurors at length on the proper use of the call recordings

and transcripts in their deliberation.  The parties were notified of the instruction in advance with

time to submit objections, Dkt. No. 191, which Tang Yuk's and Parrilla's counsel did submit,

Dkt. Nos. 189, 192.  The final instruction, which adopted nearly all of Defendants'

modifications, follows in full:

> Among the exhibits admitted during the trial were recordings that contained
> conversations that the government contends took place partially in patois as well
> as heavy accents from the Caribbean.  You also heard testimony from a witness,
> Lavern Bogle, who prepared transcripts of those conversations.  Those transcripts
> were admitted into evidence for the limited purpose of assisting you in
> understanding what is on the recordings.  Please remember, you, the jurors, must
> listen to the recordings and decide what's on them.  The recordings are evidence
> of these conversations.
>
> Whether the transcripts contain accurate translations of the portions of the
> recording that the government contends are in patois or whether they contain
> accurate transcriptions of what is being said with heavy Caribbean accents is for
> you to decide.  For example, if you conclude that a portion of the recording that

has been translated or transcribed is, in fact, unintelligible, you should reject that portion of the transcription and consider it unintelligible.

If, on the other hand, you conclude that some or all of the conversation during a recording is in patois or in a heavy Caribbean [accent] that you can hear, but do not understand, you may consult the transcripts to assist you in understanding what is being said.

In considering whether a transcript accurately describes a recorded conversation, you may consider any testimony presented to you regarding how and by whom the transcripts were made, including any challenges that were made on cross-examination or part of any defendant's case. You may consider any knowledge, training, experience and bias of the translator.

In determining whether to accept the accuracy of some or all of the transcripts or portions of the transcripts, you may consider all evidence offered by the government regarding the accuracy of those transcripts as well as any challenges that were made on cross-examination or as part of any defendant's case as to the accuracy of the transcript or transcripts. You should not, however, base your conclusions on your own knowledge of Caribbean languages.

Tr. 2053–55.

2. *Petitioners' claims*

Five of Petitioners' claims relate to the transcripts of the recordings and Ms. Bogle's qualification as an expert. Parrilla argues that his counsel was ineffective because Ms. Bogle "was unqualified and unreliable to give an expert opinion" and that there were "no source materials to confirm or refute her translations." Parrilla Petition at 5.

Tang Yuk makes three claims. First, he argues that his counsel was ineffective for not appealing Ms. Bogle's qualification as an expert to the Second Circuit. Tang Yuk Br. at 29–34. Second, that his counsel should have objected to the Court's allegedly "confusing" jury instructions, which charged that the jury should both use its "common sense" to evaluate evidence and that the jurors should not use "[their] own knowledge of Caribbean language" in evaluating Ms. Bogle's transcripts. *Id.* at 34–35 (quoting Tr. 120, 2055). And third, that his

counsel should have investigated alleged "perjury and fraud perpetrated by Ms. Bogle" in her testimony before the Court. *Id.* at 39.

Thomas contends that his counsel was ineffective for failure to "fully investigate and make specific objections regarding the audibility and accuracy of the Government's audio recordings and transcripts." Thomas Petition at 6–6a. Specifically, he contends that counsel should have sought to "strike" contested portions of the recordings and transcripts and should have "submit[ted] competing transcripts to the Court." *Id.* at 6a. Thomas additionally claims that his counsel should have sought a "written summary of Ms. Bogle's testimony prior to trial" so that he might "conduct an effective cross-examination of [her] to disqualify her at the *Daubert* hearing." *Id.* at 7–7a. He, like Parrilla, contends that further investigation of Ms. Bogle would have revealed "lies" about her work experience. *Id.* at 7f.

### 3. The absence of prejudice

As an initial matter, even if the Court fully accepts the claims raised by Petitioners regarding the transcripts vouched for by Ms. Bogle, and accepts that these facts make a sufficient showing of deficient performance, the Court concludes that Petitioners would still fail to demonstrate prejudice resulting from these errors. Three independent considerations lead to that conclusion.

First, the Court's instruction to the jury regarding the recordings and transcripts modeled those instructions given by numerous district courts and repeatedly upheld by the Second Circuit in similar cases. *E.g.*, *United States v. Gay*, 85 F. App'x 794, 795–96 (2d Cir. 2004); *United States v. Ben-Shimon*, 249 F.3d 98, 101 (2d Cir. 2001); *United States v. Koska*, 443 F.2d 1167, 1169 n.1 (2d Cir. 1971) (per curiam); *see also Tang Yuk*, 885 F.3d at 74 n.5 (describing the limiting instruction given by the Court here as "reasonabl[e]"). "A limiting instruction by the

district court concerning the use of transcripts, which includes an instruction that the jury is the ultimate factfinder, should *alleviate any prejudice arising from the introduction of the transcripts*." *United States v. Chalarca*, 95 F.3d 239, 246 (2d Cir. 1996) (emphasis added); *see also United States v. Bryant*, 480 F.2d 785, 791 (2d Cir. 1973).

Second, Petitioners have not identified any material errors in the transcripts prepared by Ms. Bogle that, taken individually or collectively, establish a reasonable probability of a different result if they had been corrected. Tang Yuk and Parrilla provide no examples of errors in the transcripts. Thomas identifies four portions of Ms. Bogle's transcripts that contained alleged errors. Thomas Petition at 6f–6h. In the first, the pivotal statement was that Jackson was "up in New York," which is reflected in both parties' accounts of the call and does not turn on any expert's translation of Patois. *Id.* at 6f–6g. Thomas emphasizes that his transcription includes a statement that the call "cut off." Thomas Petition at 6g. But the jury received the original recording of the call and so was able to determine for itself what Thomas did and did not hear. The other three ostensible errors involve only superficial differences in wording and were, in any event, not portions of conversations emphasized in the Government's case or that could be used to exculpate Thomas or his codefendants. *Id.* at 6f–6h. Petitioners' failure to identify, even now, meaningful errors in Ms. Bogle's transcripts defeats any showing of prejudice, even if counsel's performance was deficient. *See Lopez v. United States*, 792 F. App'x 32, 38 (2d Cir. 2019).

Third, the call recordings and the transcripts introduced to aid jurors' understanding of the recordings were only a piece of the Government's case against Petitioners. Even absent the recordings, there was overwhelming evidence of Petitioners' guilt. "As a result, even serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt." *Garner v. Lee*, 908 F.3d 845, 862 (2d Cir. 2018) (cleaned up).

4. *The reasonableness of counsel's conduct*

In addition to an absence of prejudice, Petitioners fail to show that their counsel acted outside the bounds of reasonable trial strategy in challenging the Government's transcripts and Ms. Bogle's qualification as an expert.

First, counsel for all three Petitioners vigorously contested the introduction of the Government's transcripts, the audibility of the recordings, and Ms. Bogle's qualifications as an expert. As explained, defense counsel cross-examined Ms. Bogle about her formal education, her transcription experience, her familiarity with the Caribbean dialects spoken by Petitioners, her ability to hear the call recordings, and her methods in transcribing what she heard. In short, defense counsel repeatedly raised precisely the issues that Petitioners now argue. *Compare, e.g.*, Tang Yuk Br. 29–33, *and* Thomas Petition at 7a–7f, *with* Tr. 557–600. That counsel did not convince the Court, or the jury, of these arguments does not render counsel's performance constitutionally deficient.[4]

Second, the new materials pertaining to Ms. Bogle submitted by Petitioners do not alter the Court's conclusion that counsel acted reasonably before and during trial. Petitioners attached a statement by a forensic linguist that questions Ms. Bogle's transcription methods, Thomas Petition at 59–62; Parrilla Reply Br., Ex. A; an investigative report that concluded some portions of Ms. Bogle's work history "seem[ed] odd," Tang Yuk Br., Ex. D; Thomas Petition at 65–67; and an email that states Ms. Bogle had never provided interpreting services to federal courts in

---

[4] To the extent Petitioners challenge directly the Court's qualification of Ms. Bogle as an expert, that challenge is either an impermissible attempt to "relitigate questions which were raised and considered on direct appeal," *United States v. Sanin*, 252 F.3d 79, 83 (2d Cir. 2001) (quoting *Cabrera v. United States*, 972 F.2d 23, 25 (2d Cir.1992)), or procedurally defaulted, *United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011).

the Southern District of Florida, Thomas Petition at 7f, 58; *see also* Tang Yuk Br. at 40 (citing this same email).

Contrary to Petitioners assertions, however, none of these documents, accepted as accurate, rise to the level of demonstrating that Ms. Bogle defrauded the Court or anything close to it. *Contra* Tang Yuk Br. at 41 (claiming that Ms. Bogle "fool[ed] this court"). First, the linguist expert, apparently on the basis of a summary of Ms. Bogle's testimony prepared by Petitioners, questions Ms. Bogle's training and characterizes her transcription method as "simplistic, inaccurate, and unreliable." Parrilla Reply Br., Ex. A at 1–2. This is a witness that defense counsel could have sought to qualify as an expert to rebut Ms. Bogle's testimony, but his generalized conclusions about Ms. Bogle's methods fall well short of alleging fraud. Second, the private investigator's report examined Ms. Bogle's curriculum vitae and financial records from a 2018 bankruptcy as well as a public social media profile. Tang Yuk Br., Ex D at 2. The report observes that her income largely came from unidentified part-time work, that her CV listed experience as a substitute school teacher and in real estate, and that no record identified a translation company. *Id.* The Court finds that no part of the report contradicts Ms. Bogle's testimony and that its sparse findings do not substantiate Petitioners' fraud allegations. Third, the email states the belief that "the Court Interpreter Service for the Southern District of Florida has never worked with Ms. Bogle in any capacity." Thomas Petition at 58. But that statement does not contradict Ms. Bogle's testimony to the Court that she had testified as an expert in a federal case in West Palm Beach five years prior. Tr. 10–11; *see* 28 U.S.C. § 1827 (describing a court interpreter office's distinct role interpreting witnesses' testimony in judicial proceedings).

More importantly, Petitioners do not demonstrate that counsel was deficient in failing to obtain this evidence in advance of Ms. Bogle's *Daubert* hearing. How to cross-examine an

expert witness and whether to obtain one's own expert are "paradigmatic" strategic choices traditionally reserved to trial counsel. *Hinton v. Alabama*, 571 U.S. 263, 274–75 (2014) (per curiam) (cautioning that courts on collateral review should not "launch . . . into examination of the relative qualifications of experts hired and experts that might have been hired"). Tang Yuk argues that counsel should have "requested a continuance or permission to retain their own expert." Tang Yuk Br. at 41. Defense counsel *did* object to the timeliness of the Government's expert-witness notice and did receive permission to retain an expert of their own. Dkt. No. 181 at 10–11; Tr. 60. The Court overruled that timeliness objection and Petitioners do not now challenge the Court's ruling. It was therefore reasonable for defense counsel to use "cross-examination . . . to expose defects in [the] expert's presentation" rather than obtain an opposing expert witness. *Harrington*, 562 U.S. at 111.

Third, Parrilla's claim that counsel should have appealed the issue of the transcripts to the Second Circuit similarly fails. As explained, the Court correctly ruled that the transcripts could be used as an aid in listening to the recordings and that an expert may be presented to vouch for the transcripts' accuracy. Counsel's decision not to appeal was therefore reasonable. *See Lopez*, 792 F. App'x at 38. Even if the appeal was colorable, "[a]ppellate counsel does not have a duty to raise all colorable claims on appeal; rather, counsel should use reasonable discretion to determine which claims constitute a defendant's best arguments for obtaining a reversal of a conviction." *Forte v. LaClair*, 354 F. App'x 567, 569 (2d Cir. 2009).[5]

---

[5] Prejudice is also absent here because even though Parrilla did not raise Ms. Bogle's qualifications to the Second Circuit, Thomas did, and the Second Circuit did not accept his arguments. *See* Thomas Br., *United States v. Tang Yuk*, 2015 WL 9809944 (2d Cir. 2015), 12–14.

Fourth, Tang Yuk's counsel acted reasonably in not objecting to the Court's instructions that, read together, instructed jurors to use their "common sense" and "experience" but not to use their "own knowledge of Caribbean language." Tr. 120, 714, 2055; Tang Yuk Br. 34–35. These instructions, taken in context, were neither contradictory nor likely to confuse jurors as required for counsel to raise a successful objection. *Hudson v. New York City*, 271 F.3d 62, 67 (2d Cir. 2001). And even if such an objection had been colorable, counsel's decision not to make it was not deficient. *See Plitman*, 194 F.3d at 63.

## C. Parrilla's remaining *Strickland* claims

Parrilla raises three remaining claims of ineffective assistance of counsel. Parrilla did not further advance these claims in his reply. The Court concludes that none have merit.

### 1. *Admission of Parrilla's threatening statements*

Parrillas argues first that his counsel should have objected to the admission of threatening statements that Parrilla made, either because they were inadmissible hearsay or because the probative value of the statements was substantially outweighed by their unfair prejudicial effect. Parrilla Petition at 8; *see* Fed. R. Evid. 403, 802.

The Government filed a motion in limine to admit testimony by Jackson that, while in prison, Jackson received several statements through third parties that Jackson understood to come from Parrilla and to be threatening in nature. Dkt. No. 128 at 23–26. The Government claimed the testimony was "probative of [Parrilla's] consciousness of guilt." *Id.* at 24. Parrilla's counsel opposed admission, arguing the statements were not threatening and were "substantially more prejudicial than probative." Dkt. No. 139 at 6. The Court granted the Government's motion, Dkt. No. 160 at 17–18, Jackson recounted the statements in his trial testimony, Tr. 863–64, and defense counsel cross-examined Jackson on the statements, Tr. 956–62.

Parrilla's counsel therefore acted reasonably and Parrilla was not prejudiced by his counsel's conduct.  Counsel objected as Parrilla argues he should have, and the Court properly denied that objection, observing that such evidence is regularly admitted.  Dkt. No. 160 at 17–18 (citing, for example, *United States v. Perez*, 387 F.3d 201, 208–10 (2d Cir. 2004)).  Moreover, the exclusion of this piece of Jackson's testimony, though cited in the Government's closing statement, Tr. 1980, would not have created a reasonable probability of a different result necessary to establish prejudice given other overwhelming evidence of Parrilla's guilt.

2.  *Parrilla's counsel's opening statement*

Second, Parrilla argues that his counsel made remarks during his opening statement that had little probative value and prejudiced Parrilla.  Parrilla Petition at 9.  Specifically, Parrilla's counsel stated in his opening that when the Government executed a search warrant of Parrilla's shop, they brought "15 to 20 officers." Tr. 135–36.  Parrilla argues that statement made him appear "dangerous" to the jury.  Parrilla Petition at 9.

It is well-established that "the decision whether to make an opening statement and when to make it is ordinarily a matter of trial tactics and strategy which will not constitute the incompetence basis for a claim of ineffective assistance of counsel." *Nersesian*, 824 F.2d at 1321.  Consequently, "the contents of that opening statement—within certain limits—may also be decided by trial counsel." *Yannai v. United States*, 346 F. Supp. 3d 336, 343 (E.D.N.Y. 2018).  Here, Parrilla's counsel used the fact that 20 officers executed the search warrant to emphasize the fact that none of those officers found any cocaine at Parrilla's shop, demonstrating his innocence.  Tr. 136 ("They went in, and for several hours they searched. They turned it over. They looked into every container. . . . And guess what they found? Nothing.").  The Court

25

concludes this tactic was a reasonable exercise of trial counsel's discretion and did not prejudice Parrilla.

### 3. *Testimony of Detective Foster*

Third, Parrilla argues his counsel erred in calling a witness that, on the Government's cross-examination, made statements prejudicial to Parrilla. Parrilla Petition at 9. Present at the search of Parrilla's shop was a K-9 directed by Detective Julie Foster. Tr. 136. Parrilla's counsel called Foster as a witness, and she testified on direct examination that a search of the materials in Parrilla's garage did not identify any narcotics residue, which arguably contradicted Jackson's testimony that those materials had previously contained cocaine. Tr. 1690. Parrilla faults his counsel for calling Foster as a witness because she also testified that the K-9 alerted to a narcotics odor emanating from a vehicle near Parrilla's garage. Parrilla Petition at 9; Tr. 1691–92. Additionally, the Government on cross-examination elicited statements that the K-9 alerted to narcotics odors elsewhere in Parrilla's garage, but not near the materials that were the subject of Jackson's testimony. Tr. 1698–99.

The Court concludes that Parrilla's counsel acted reasonably and that his conduct did not prejudice Parrilla. Parrilla's counsel made the reasonable decision that the value of Foster's exculpatory statements justified the risk that Foster would also make statements that inculpated Parrilla. Trial counsel has wide strategic latitude to call witnesses and to question them. *See Eisen*, 974 F.2d at 265. The absence of drug residue in Parrilla's garage was a central fact that Parrilla's counsel emphasized both in opening and closing. Tr. 135–36, 1899–901. Notably, Parrilla does not suggest an alternative way that counsel could have brought this important fact to the jury's attention. Counsel's strategic decision was therefore reasonable and Parrilla fails to demonstrate prejudice resulting from it.

**D. Tang Yuk's remaining *Strickland* claims**

Tang Yuk raises six additional *Strickland* claims.  The Court again concludes that none are meritorious.

*1. Multiple-Conspiracies Instruction*

Tang Yuk first argues that his counsel should have objected to a limiting instruction the Court gave.  Tang Yuk Br. at 8–13.  Specifically, Petitioners' defense at trial included the theory that Jackson had obtained cocaine from other individuals not charged in the indictment, namely Duane Stapleton and Fred Fulton, rather than from Petitioners.  *Id.* at 9–11; *e.g.*, Tr. 1898 (Parrilla summation); Tr. 1925, 1933 (Thomas summation); Tr. 1938–40 (Tang Yuk summation).  Parrilla's counsel persuaded the Court that this was a permissible defense strategy, and the Court overruled the Government's objections to questions about Stapleton's involvement with Jackson.  Tr. 376–91.  Parrilla's counsel did not object to the Court giving a limiting instruction, as requested by the Government, to disregard any hearsay elicited in such questioning.  Tr. 392–94.

At Petitioners' request, and over the Government's objection, the Court gave a multiple-conspiracies instruction.  Tr. 1813.  The Court denied an additional alternative-conspiracies instruction because it concluded that the multiple-conspiracies instruction sufficiently addressed the issue.  Tr. 1813–14.  The Court instructed as follows:

> In this case, the defendants contend that the government's proof fails to show the existence of only one overall conspiracy. Rather, they claim that there were actually several separate and independent conspiracies with various groups of members.
>
> Whether there existed a single unlawful agreement or many such agreements or, indeed, no agreement at all, is a question of fact for you, the jury, to determine in accordance with the instructions I am about to give you.
>
> [. . .]
>
> On the other hand, if you find that the conspiracy charged in the indictment did not exist, you cannot find any defendant guilty of the single conspiracy charged in

the indictment. This is so even if you find that some conspiracy other than the one charged in the indictment existed, even though the purposes of both conspiracies may have been the same and even though there may have been some overlap in membership.

Similarly, if you find that a particular defendant was a member of another conspiracy, and not the one charged in the indictment, then you must acquit the defendant of the conspiracy charge.

*Id.* 2036–38.

Tang Yuk faults his counsel for (1) stating that he had no objection to the Court's hearsay limiting instruction, and (2) not submitting an "alternate suspect" instruction. Tang Yuk Br. at 12. Neither criticism is meritorious. First, whether to raise an objection is presumed to be a strategic decision reserved to trial counsel. *Ambers*, 2019 WL 3767036, at \*7. More importantly, Tang Yuk's counsel did exactly what Tang Yuk now argues he should have done. He persuaded the Court to permit him to ask about Jackson's association with Fulton and Stapleton in service of Parrilla's defense that Jackson did not obtain cocaine in connection with Tang Yuk. The Court's hearsay limiting instruction was a function of Federal Rule of Evidence 802 and it was reasonable for Tang Yuk's counsel not to object to it. Second, as explained, defense counsel *did* submit an alternate-conspiracy instruction, which the Court denied in favor of the multiple-conspiracy instruction that defense counsel also proposed. Tr. 1813–14. Tang Yuk identifies no error in the instruction the Court gave. Nor does the Court find that Tang Yuk suffered any prejudice.

### 2.  *Missing-Witness Instruction*

Tang Yuk next argues that his counsel should have requested a missing-witness instruction and objected to the Court's uncalled-witness instruction. Tang Yuk Br. at 13–18. Defense counsel referred to Velazquez in aid of their defense throughout trial. E.g., Tr. 153 (Thomas opening statement); Tr. 423, 63–67 (cross-examination of Giraldo). In his closing,

Tang Yuk's counsel emphasized the important role Velazquez played in Jackson's drug trafficking and he told the jury to "think about Lizette Velazquez." Tr. 1938–41.

Velazquez did not testify at trial. The Court gave the jury the following uncalled-witness instruction:

> There are several people whose names you've heard during the course of the trial who did not appear here to testify. I instruct you that each party had equal opportunity or lack of opportunity to call any of these witnesses. Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called. Their absence should not affect your judgment in any way. You should, however, remember my instructions that the law does not impose on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

Tr. 2057.

"It is well settled that when a party has it peculiarly within its power to produce witnesses and fails to do so, the jury may infer that the testimony, if produced, would be unfavorable to that party." *United States v. Adeniji*, 31 F.3d 58, 65 (2d Cir. 1994) (quoting *United States v. Myerson*, 18 F.3d 153, 158 (2d Cir.1994)). But "[w]here the witness is equally available to both parties, an instruction on this inference is inappropriate." *Id.* Here, considering all "the facts and circumstances of this case," the Court concludes that Velazquez was available to call as a witness and a missing-witness instruction would have been inappropriate. *United States v. Torres*, 845 F.2d 1165, 1170 (2d Cir. 1988). Counsel's decision not to request a missing-witness obstruction was therefore reasonable.

Tang Yuk argues that Velazquez was unavailable to him because her "interests were not in line with being available to the Petitioners." Tang Yuk Reply Br. at 8; *see also* Tang Yuk Br. at 18 ("As a government cooperator she would most naturally refuse to talk to the defendant's counsel."). But criminal defendants have the power, via a subpoena, "to command the witness to attend and testify at the time and place the subpoena specifies." Fed. R. Crim. P. 17(a). Had

Tang Yuk's counsel sought to call Velazquez as a witness and issued a subpoena to do so, she would have been required to attend and testify truthfully under penalty of contempt, absent some adequate excuse. Fed. R. Crim. P. 17(g). This mechanism was available to Tang Yuk even if, as he claims, Velazquez was cooperating with the Government. Tang Yuk Br. at 14.

Even if Tang Yuk demonstrated the reasonableness prong, however, he would for several reasons still fail to establish prejudice. First, Tang Yuk does not state with particularity what he would expect Velazquez to testify that would, as required, create a reasonable probability of a different result. He, at most, provides several open-ended questions that, he alleges, "could only be answered by her." Tang Yuk Br. at 17. The claim that Velazquez would have necessarily provided answers that exculpated Tang Yuk is too speculative to establish prejudice. *Cf. United States v. Best*, 219 F.3d 192, 202 (2d Cir. 2000). Second, Tang Yuk's claim rests on the allegation that Velazquez was heavily involved in Jackson's narcotics conspiracy. Yet as the Government observes, if that allegation is true, Velazquez would have likely invoked the Fifth Amendment in refusing to testify, which again would have prevented Tang Yuk from eliciting any exculpatory testimony. *See United States v. Matthews*, 20 F.3d 538, 545 (2d Cir. 1994) ("A declarant who invokes his Fifth Amendment privilege against self-incrimination and refuses to testify at trial is unavailable . . . .").

### 3. The Government's statements in support of Jackson's credibility as a witness

Tang Yuk next claims that his counsel should have objected to two different remarks made by the Government to bolster the credibility of Jackson as a witness. *First*, the prosecutor in his summation framed for the jury, "The question is whether [Jackson] told you the truth about this conspiracy." Tr. 1851. The prosecutor stated that Jackson could be believed because, among other reasons, his agreement with the Government was an "incentive to tell the truth" and

because other evidence verified his account. Tr. 1851–52. Near the end of his rebuttal summation, the prosecutor reiterated that other evidence supported Jackson's testimony, and stated, "Just like I said, he's not trying to bend the truth . . . ." Tr. 1978. Parrilla's counsel immediately objected to the remark, and the Court overruled the objection. Tr. 1978. Tang Yuk argues that his counsel should have appealed this objection. Tang Yuk Br. at 20.

The Court concludes that Tang Yuk's counsel acted reasonably. Tang Yuk's counsel did appeal the issue of allegedly improper remarks made by the Government in summation, but he made a strategic decision to focus on other remarks than those Tang Yuk highlights in his briefing. *Tang Yuk*, 888 F.3d at 87–88. That decision was a reasonable exercise of counsel's discretion. *Forte*, 354 F. App'x at 569. There was good reason for counsel not to appeal the Government's statements regarding Jackson's credibility because they were proper responses to defense counsel's efforts to impeach Jackson. *See United States v. Carr*, 424 F.3d 213, 227 (2d Cir. 2005). Moreover, the Government's isolated use of the pronoun "I" was a minor "improvisation" unlikely to be found erroneous on appeal, *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011), and even less likely to be "so severe and significant as to have substantially prejudiced him, such that the resulting conviction was a denial of due process," *United States v. Williams*, 690 F.3d 70, 75 (2d Cir. 2012); *cf. Nersesian*, 824 F.2d at 1328 ("[I]t is a poor practice . . . for prosecutors to *frequently* use rhetorical statements punctuated with *excessive* use of the personal pronoun 'I'." (emphasis added)). Consequently, Tang Yuk suffered no prejudice, and his counsel was not deficient in choosing not to appeal the issue.

*Second*, Tang Yuk points to statements made by a Government witness, Agent Giraldo, on cross-examination. Several of those answers responded to defense questions about how the Government determined that Jackson was telling the truth. Giraldo responded, at various points,

that "[Jackson] corroborated himself in a hundred other ways that he was telling the truth," Tr. 441, and, "We would need to corroborate every statement they make just to make sure that we are dealing with somebody that is being truthful," Tr. 501.  Tang Yuk also identifies several answers that Giraldo gave that arguably exceeded the scope of the question asked.  Tang Yuk Br. 21–22.  Defense counsel objected, calling Giraldo's answers "gratuitous," not "responsive," and "evasive."  Tr. 519–21.

The Court again finds Tang Yuk's counsel was not deficient.  Counsel objected to the very testimony that Tang Yuk highlights in his brief.  To be sure, counsel did not raise the particular objection that Giraldo impermissibly "vouched" for Jackson's credibility.  Tang Yuk Br. at 23.  But counsel's decision to object to some aspects of testimony but not others is a permissible strategic choice.  Any objection to Giraldo vouching for Jackson would have been unsuccessful, as his statements about why the Government believed Jackson's statements were "permissible reference[s] to the evidence in the case," *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998), and not, as Tang Yuk suggests, impermissible speculation about a witness's credibility, *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1998).  Counsel's conduct was therefore reasonable.  And even if counsel had raised further objections and those objections had succeeded, the Court finds no reasonable probability that the result would have differed.

*4.  Government's Discovery Production*

Tang Yuk next identifies error in the Government's discovery production; specifically, the content of Jackson's cell phone.  Tang Yuk Br. at 24–27.  The Government produced thousands of photos and text messages on Jackson's phone three months in advance of trial.  *See Tang Yuk*, 885 F.3d at 86.  During a break in Jackson's cross-examination, Thomas's counsel discovered photos of a suitcase containing cocaine and a firearm.  *Id.* at 86.  The photos'

metadata suggested they were taken on August 20, 2012, *before* Jackson obtained cocaine from any Petitioner. *Id.* The Government stipulated to the dates of the photos. Tr. 1203–05. Thomas's counsel cross-examined Jackson on the photos, and Jackson denied ever seeing the photos and had no explanation why they were on his phone. Tr. 1228–35.

Tang Yuk argues that his counsel should have identified the photos earlier and conducted an investigation to "show *with some certainty* that Jackson had taken those photos." Tang Yuk Br. 26–27. The Court concludes that this argument does not establish deficient performance or prejudice. Most notably, Tang Yuk does not identify what additional evidence his counsel could have discovered with additional investigation. In fact, the Government investigator that reviewed the photos determined that only one of the photos could have been taken by Jackson's phone's camera and that the others were "potentially received or sent as photographs on the phone." Tr. 1521. Tang Yuk has not demonstrated that additional investigation would have changed that conclusion. Additionally, counsel acted reasonably in allocating their pretrial preparation toward other investigative efforts rather than reviewing thousands of photos and text messages that had an uncertain likelihood of yielding exculpatory evidence.[6] Last, Tang Yuk was not prejudiced by counsel's lack of prior investigation. Counsel effectively cross-examined Jackson, who admitted to having no explanation as to why he had multiple photos of cocaine and a firearm on his phone more than a week before he obtained cocaine from Thomas. The Court finds no reasonable probability that additional investigation would have altered the effect of this cross-examination or the ultimate outcome.

5. *Admission of Alleged Post-Conspiracy Conduct*

---

[6] Notably, these materials were not searchable or indexed, necessitating a time-intensive image-by-image review by defense counsel. *Tang Yuk*, 885 F.3d at 86–87.

Tang Yuk argues that the Court should not have admitted statements made by Tang Yuk to any co-conspirator after Jackson began cooperating with the Government on September 22, 2012, and that his counsel was therefore ineffective for failing to appeal the statements' admission. Tang Yuk Br. at 27–29.

The Court finds this claim lacking for several reasons. First, counsel made strategic choices about what to appeal and his decision not to appeal an evidentiary objection, which is reviewed only for abuse of discretion, was reasonable. Second, Tang Yuk is incorrect that the conspiracy ended on September 22, 2012. The Government charged that the conspiracy continued until May 2013. Tr. 2021. Evidence introduced by the Government demonstrated that Petitioners intended their possession and distribution efforts to continue even after September 2012. *E.g.*, Tr. 1856. ("We got a new captain on the team now. . . . We got to change up the crew.").[7] Even accepting Tang Yuk's assertion that no overt acts of the conspiracy occurred after September 2012 is insufficient to show the conspiracy ended. *See United States v. Anderson*, 747 F.3d 51, 60 n.7 (2d Cir. 2014). The Court concludes that Tang Yuk's counsel acted reasonably. And even if counsel had appealed an objection, there is no reasonable probability that the evidence would have been excluded or that exclusion would have a reasonable probability of producing a different result.

6. *Failure to investigate juror bias*

Last, Tang Yuk contends that counsel should have asked the Court to investigate the possible bias of a juror. Tang Yuk Br. at 35–39; Tang Yuk Reply Br. at 17–18.

---

[7] That the conspiracy continued at the time of the recorded statements distinguishes Tang Yuk's case from that in *Krulewitch v. United States*, 336 U.S. 440 (1949).

The morning of the last day of trial, the Court notified counsel that one juror had arrived late and had left two voicemails with the Court, one stating that he was "running late" and another that he was "doing some soul-searching." Tr. 1996. The Court further notified counsel that this juror was the same juror that had attempted to ask the Court several questions earlier in the trial. Tr. 1996–97; *see* Tr. 534 (juror approached the deputy to ask "what the meaning of hearsay is"); Tr. 1343 (juror asked the Court, "Can I ask you a question?" to which the Court responded "No . . . ."). When he arrived, the juror told the Court deputy, "I'm sorry I'm late. It just -- it hit my conscience, the magnitude of it." Tr. 1997. Upon hearing this information, the Government moved to replace the juror with an alternate, Tr. 1997–98, and requested the Court inquire further into the juror, Tr. 2003. Counsel for all three Petitioners opposed that motion. Tr. 1998–2001, 2003–08, 2010. With all parties' approval, the Court called for the juror and asked that he reaffirm his "oath to render a verdict based only on the evidence or lack of evidence" setting aside his "own views of the law." Tr. 2013. The juror "answered affirmatively without hesitation" and was returned to the jury room. Tr. 2013.

Tang Yuk's insistence that his counsel should have requested additional investigation under these circumstances is without merit. "A criminal defendant is guaranteed a trial 'by an impartial jury.'" *United States v. Torres*, 128 F.3d 38, 42 (2d Cir. 1997) (quoting U.S. Const. amend. VI). That guarantee is violated if a juror "had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount*, 467 U.S. 1025, 1035 (1984). Tang Yuk does not offer direct proof of actual bias but instead suggests that bias can be presumed from the juror's statements. Yet bias may be presumed in this way "only in 'those extreme situations where the relationship between a . . . juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his

deliberations.'" *Torrez v. Sabourin*, No. 00 CIV. 3286 (AGS), 2001 WL 401444, at *7 (S.D.N.Y. Apr. 19, 2001) (quoting *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988)).

The statements cited by Tang Yuk do not rise to that level.  Rather than suggest that the juror was biased, the statements demonstrate that the juror was taking his oath seriously.  Nor do the juror's statements support an inference that he was "affected by extraneous evidence."  Tang Yuk Br. at 38.  And when questioned by the Court, the juror credibly affirmed that he could assess the case impartially.  The Court concludes that Tang Yuk's counsel acted reasonably in deciding not to request additional inquiry into the juror.

Additionally, Tang Yuk does not make a showing of prejudice.  Generally, "undetailed and unsubstantiated assertions" that further investigation of some kind should have been done "have consistently been held insufficient to satisfy either *Strickland* prong."  *Paige v. Lee*, 99 F. Supp. 3d 340, 349 (E.D.N.Y. 2015) (quoting *Powers v. Lord*, 462 F.Supp.2d 371, 381 (W.D.N.Y. 2006)).  Tang Yuk suggests no "avenues" that, if explored, "might have altered the outcome" of the Court's determination of impartiality.  *United States v. Vargas*, 871 F. Supp. 623, 624 (S.D.N.Y.1994).  The Court therefore concludes that there was no reasonable probability of a different result had Tang Yuk's counsel requested an investigation.

### E.  Thomas's remaining *Strickland* claims

Thomas makes three remaining claims of ineffective assistance of counsel, the first of which he raised in his initial § 2255 motion and two of which he raised only in his second reply brief after he had obtained additional documents with the Government's assistance. The Court addresses each claim in turn and concludes that none are an adequate basis for relief.

*1.  Thomas's claim that his counsel did not adequately investigate his third-party culpability defense*

Thomas's primary claim is that his counsel "failed to fully investigate and properly execute a third-party culpability defense at trial." Thomas Petition at 5–5a. In support, Thomas identifies approximately twelve items of potential evidence either that his counsel should have discovered during his investigation and admitted at trial or that his counsel should have objected to. *Id.* at 5–5t. Had the evidence been admitted, Thomas argues, the jury would have likely "acquitted Thomas of the charged conspiracy." *Id.* at 5w.

The Court first reiterates that decisions about trial strategy, the defenses to be raised, and the evidence to be introduced, are reserved to trial counsel and, except in exceptional circumstances, are not proper grounds for an ineffective-assistance claim. *See Eisen*, 974 F.2d at 265. Counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Yet that duty does not "compel defense counsel to investigate comprehensively every lead or possible defense or 'to scour the globe on the off-chance something will turn up.'" *Greiner v. Wells*, 417 F.3d 305, 321 (2d Cir. 2005) (citation omitted) (quoting *Rompilla v. Beard*, 545 U.S. 374, 383 (2005)). Rather, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 690–91.

In determining whether a defendant was prejudiced by counsel's "failure to investigate and introduce certain evidence," the Court "must consider '*all* the relevant evidence that the jury would have had before it' had the evidence been introduced, including unfavorable evidence." *Barnes v. Burge*, 372 F. App'x 196, 199 (2d Cir. 2010) (quoting *Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (per curiam)). And even if counsel erred in some aspects of his investigation, "it is

37

difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Harrington*, 562 U.S. at 111.

a. Forensic testing of the shipping container

Thomas argues that his counsel should have arranged for forensic testing of the shipping container that Jackson testified he and Thomas stored cocaine in to determine if it contained drug residue. Thomas Petition at 5–5a, 5k. But Jackson testified that the cocaine was placed in a wooden crate and remained "wrapped in a plastic covering," Tr. 698, which belies Thomas's assertion that the cocaine "inevitably[] left traces of drug residue inside the container," Thomas Petition at 5k. Moreover, Thomas and his counsel examined the container in June 2013, nine months after Jackson testified that cocaine had been in the container. Thomas Petition at 5; Tr. 691. It was therefore reasonable for Thomas's counsel to conclude that forensic testing would have had little value at trial. Instead, Thomas's counsel cross-examined the Government's witness on the lack of corroborating evidence that cocaine was ever in the container. *See* Tr. 329–32, 347–48; *Harrington*, 562 U.S. at 111 ("In many instances cross-examination will be sufficient to expose defects in an expert's presentation."). That decision was not constitutionally deficient and did not prejudice the result.

b. Video surveillance

Thomas argues that counsel should have acquired video surveillance aimed at that same shipping container to demonstrate that Thomas and Jackson never entered the container to pack cocaine on August 31, 2012. Thomas Petition at 5l. Thomas explained in June 2013 that the security camera "server had the capacity to record from six to ten months of video footage" but that the server had been "changed-out . . . about seven months ago." *Id.* at 5a. Thomas argues

38

that his counsel should have located the man that uninstalled the box, "interviewed him, and retrieved the Security Box for forensic analysis." *Id.* at 5m.

The Court finds that counsel's decision to focus his investigative efforts on other pieces of the defense was a reasonable strategic choice. Thomas only speculates that security camera equipment repossessed seven months prior would still contain footage from nine months earlier. Counsel did not have a duty to investigate such a speculative lead. Instead, counsel again emphasized to the jury that it was the Government's burden of proof and that they had provided no "video surveillance." Tr. 1921. That strategy was a reasonable one.

c.   Employee witnesses

Referring again to the shipping container, Thomas contends that his counsel should have called as witnesses two employees of his, both of whom would have testified that they "did not see CW Jackson at Paradise Waste at any time on August 31, 2012," corroborating Thomas's defense. Thomas Petition at 5l; *see also id.* at 5h (telling counsel about these two employees). Thomas attached to his reply notarized letters from these two employees, both of which state that they would have testified that they assisted Thomas in packing the wooden crate in question but did not pack any narcotics. Thomas Reply Br., Attachs. 1, 2.

Counsel's decision not to call these witnesses was reasonable. Counsel privately interviewed both employees identified by Thomas prior to trial "for approximately 45 minutes" each. Thomas Petition at 5e–5f.[8] The Court finds that counsel, after conducting that investigation, was not obligated to interview those employees further. *See Rompilla*, 545 U.S. at

---

[8] Thomas notes that counsel did not interview other employees at Paradise Waste. Thomas Petition at 5e. But the other employees Thomas identifies had only "information related to the origin and use of wood crates at Paradise Waste," not any personal knowledge of the shipping container or wooden crate at issue in the case. *Id.*

383. And the decision whether to call those witnesses at trial was an informed tactical choice made by counsel. *Bezmalinovic v. United States*, No. 04 CIV 7569MGC, 2005 WL 1803723, at *6 (S.D.N.Y. July 29, 2005).

    d.  The wooden crate

Thomas claims that counsel additionally should have collected evidence regarding the wooden crate that Jackson testified had a false bottom to store cocaine. Thomas Petition at 5m–5n; Tr. 753. Specifically, he argues that counsel should have subpoenaed the crate, which Thomas believed to be in "Jackson's warehouse," and should have called as witnesses individuals that could have testified to the creation of the wooden crates and that no crate was built with a false bottom. *Id.* at 5g, 5m.

Neither action was required of counsel to provide reasonable representation. As to the subpoena, Jackson testified was that he "unscrewed the bottom of the wooden floor" and later placed "brake pads" in the crate, which he then delivered alongside other crates to "the Caterpillar dealer." Tr. 753, 756. Thomas's claim therefore rests on the assumptions that Jackson (a) reclaimed the crate from the dealer, (b) reconstructed the crate's false bottom, and (c) retained the crate in his warehouse for nearly nine months. Counsel acted reasonably in not subpoenaing the crate for trial.[9]

Nor did counsel err in failing to call witnesses about the construction of wooden crates used in Thomas's business. Thomas attached to his reply a notarized letter of an individual that built crates for Thomas, which states that the man never built a crate with a false bottom. Thomas Reply Br., Attach. 3. Counsel's decision not to call this witness or a similar one was not

---

[9] Thomas also suggests that "the United States, through its agents, destroyed the wooden crate." Thomas Petition at 5n. He presents no evidence to conclude that this is true.

unreasonable. *See Pavel v. Hollins*, 261 F.3d 210, 220 (2d Cir. 2001) ("The Constitution does not oblige counsel to present each and every witness that is suggested to him."). Thomas additionally states that counsel should have called Thomas to testify to "lay the proper foundation" for these crate-related witnesses. Thomas Petition at 5m. Counsel undeniably acted reasonably in determining that the defendant should not be subject to cross-examination to provide testimony with only speculative probative value.[10] Instead, defense counsel strategically emphasized that the Government offered no evidence of the wooden crate. *E.g.*, Tr. 1892–93.

e. Witness "Jr."

Thomas argues that counsel should have also called as a witness a man referred to as "Jr." in Thomas's motion. Thomas Petition at 5n. According to Thomas, Jr. was incarcerated in St. Croix, *id.* at 5d, and would have testified that Jackson paid $5,000 to Thomas to satisfy an outstanding loan rather than for cocaine, *id.* at 5n, and that Jr., not Thomas, "made the cocaine deal" with Jackson, *id.* at 5q. Here, again, the Court concludes that counsel's decision not to pursue an incarcerated witness who, as Thomas shows, had an incentive not to provide exculpatory testimony, was reasonable and within counsel's discretion.

f. Building contractor documents

Next, Thomas argues that counsel should have obtained "building contractor documents" that "would have rebutted CW Jackson's assertions that he met with Thomas at the Transfer Station," because Jackson's testimony instead identified the "General Engineering Construction Building." *Id.* at 5n. Thomas informed counsel of this misidentification during Jackson's direct examination, and counsel answered, "What's the difference." *Id.* at 5g. Counsel chose to not

---

[10] Importantly, Thomas does not aver that he ever requested the opportunity to testify at trial. *See Brown v. Artuz*, 124 F.3d 73, 74 (2d Cir. 1997).

raise this point during cross-examination but did ask a series of other questions with the intent of impeaching Jackson. That strategic choice was reasonable. *See Eisen*, 974 F.2d at 265. And the Court finds no reasonable probability that introducing contractor documents on the issue of the building identification would have altered the result.

g.   Admission of the Stingray-derived and geolocation evidence

Thomas argues that counsel should have sought "the suppression of all GPS location data, metadata, and unique electronic serial numbers illegally obtained from Thomas, Parrilla, and Tang Yuk's . . . cellular telephones, by the United States, through the use of Stin[g]ray Cell Site Simulator Technology." Thomas Petition at 5o; *see also* Thomas Reply Br. at 28–37.[11] But for two independent reasons, such a motion to suppress would have been unsuccessful, making counsel's decision reasonable. First, Thomas provides no citation for concluding the Government employed the Stingray without a warrant. Indeed, Thomas attached an exhibit that the Stingray was "authorized by the New York GPS Ping Order." Thomas Suppl. Reply Br., Attach. 5 (Ex. 3512-A). Second, the Government witness testified that the Government tracked the phone only of Jackson, not of Thomas or another Petitioner. Tr. 1595–99; *see also* Thomas Suppl. Reply Br., Attach. 5. Thomas therefore lacks Fourth Amendment standing to exclude the evidence collected through use of the Stingray. *See Rakas v. Illinois*, 439 U.S. 128, 134 (1978) ("A person who is aggrieved by an illegal search and seizure only through the introduction of

---

[11] "A cell-site simulator—sometimes referred to as a 'StingRay,' 'Hailstorm,' or 'TriggerFish'— is a device that locates cell phones by mimicking the service provider's cell tower (or 'cell site') and forcing cell phones to transmit 'pings' to the simulator. The device then calculates the strength of the 'pings' until the target phone is pinpointed." *United States v. Lambis*, 197 F. Supp. 3d 606, 609 (S.D.N.Y. 2016). This Court has held that its use is a search of the individual whose location is tracked, requiring a warrant under the Fourth Amendment. *Id.* at 611; *see also Carpenter v. United States*, 138 S. Ct. 2206, 2219 (2018) (holding that extensive tracking of an individual's cell-site location information can be a search).

damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.").

    h.  Shipping invoices

Thomas next argues that his counsel should have submitted a shipping "invoice for the delivery of the [racing] engine" for which Thomas alleges he paid $18,500 to Luis Jimenez. Thomas Petition at 5o–5p; *see also id.* at 5i.  He paid Jimenez the $18,500 in cash carried in a brown bag.  *Id.* at 5o.[12]  Thomas argues that the invoice would have demonstrated the payment was "legitimate," not made in furtherance of narcotics distribution.  *Id.*

The Court concludes that counsel acted reasonably and that his decision did not prejudice Thomas.  First, counsel could have reasonably concluded that the invoice had little probative value, especially because the $18,500 figure does not match the Government witness's testimony that Thomas delivered $23,429 in cash.  Tr. 1546.  Second, counsel told Thomas, "Get me the documents immediately."  Thomas Petition at 5i.  Thomas's failure to do so while he was not in custody is not a valid basis for an ineffective assistance of counsel claim.  Last, Thomas has not shown a realistic probability that if the invoices were introduced, the jury would have come to a different conclusion.[13]

    i.  Road sensor information

---

[12] Thomas additionally argues that he delivered the money in a "brown leather laptop computer bag," Thomas Petition at 5o, not a brown "paper bag," *id.* at 5i.  The witness testified that it was a "normal bag," and did not specify its color or material.  Tr. 1546.

[13] Thomas again states that his counsel should have called him "as a witness to lay the proper foundation for the introduction of the [invoice]."  Thomas Petition at 5p.  To the extent that calling Thomas as a witness was necessary to admit the invoice, counsel's decision not to pursue this line of argument was even more reasonable.

Thomas claims that his counsel should have obtained "road sensor information," which would have demonstrated that the road where Thomas and Parrilla met had a high density of traffic, contradicting the Government's depiction of the road as a secluded side road. Thomas Petition at 5p.[14]  But, like the introduction of the contractor documents above, the introduction of road sensor information concerns strategic questions of which evidence to introduce and on what ground to cross-examine the Government's witnesses. The Court concludes that Thomas's counsel acted reasonably in pursuing the strategy that he did.

j.   Calls from jail

Thomas attached to his motion two transcripts of phone calls between Jackson and Jr. Thomas Petition at 5q, 71–73, 77–82. He argues that these transcripts demonstrate that Jr., not Thomas, sold cocaine to Jackson and that Jackson cooperated with the Government only to protect his wife, Velazquez. *Id.* at 5q. The Court does not agree that these transcripts support an ineffective-assistance claim. First, defense counsel obtained these calls, and transcribed them, as part of their investigation. *Id.* at 5h. Counsel's decision not to use the calls, after adequate investigation, was reasonable. *Strickland*, 466 U.S. at 690. Second, the Court does not agree with Thomas's description of the transcripts. At the least, counsel could have concluded that the calls were not sufficiently clear to submit at trial as Thomas suggests. Third, counsel instead raised the issues of third-party culpability and Jackson's incentives to testify through thorough cross-examination. *E.g.*, Tr. 359–60, 364, 463, 467, 1092–93, 1142, 1154. The Court finds that strategic approach was reasonable, and that introduction of the jail calls did not have a reasonable probability of altering the result.

---

[14] Thomas does not provide a record citation for the Government's statement with which he takes issue. Thomas Petition at 5i.

k.  Remaining evidentiary claims

Thomas's claims that his counsel should have obtained experts to translate and transcribe the call recordings, Thomas Petition at 5p–5p.1, is resolved by this Court's above analysis on the matter of the transcripts and the Government's Patois expert.

Additionally, Thomas, like Tang Yuk, argues that his counsel should have identified the photos on Jackson's phone earlier and should have "retain[ed] the services of their own forensic investigator to analyze the phone."  Thomas Petition at 5q–5q.1.  This claim fails for the same reasons as Tang Yuk's claim does as explained above.[15]

Last, Thomas generally asserts violations of *Napue v. Illinois*, 358 U.S. 919 (1958), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), that his counsel "failed to bring to the Court's attention."  Thomas Petition at 5p.1.  Because the Court finds there to be no meritorious claim that counsel could have raised, his conduct was not deficient.  *See Nersesian*, 824 F.2d at 1322 ("Counsel certainly is not required to engage in the filing of futile or frivolous motions.").

2.  *Thomas's claims raised first in his second reply brief*

As recounted, Thomas obtained his trial counsel's records after filing his reply brief.  The Court afforded Thomas the opportunity to review these materials and to "supplement his reply brief," but it warned Thomas that "new arguments cannot usually be raised in a reply brief." Dkt. No. 362 (citing *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009)). Thomas then filed a second and a third reply brief that both reiterated his ineffective-assistance

---

[15] Thomas also argues in his second reply brief that the GPS tracking of Jackson showed that on August 20, 2012, his phone was in St. Croix at Duane Stapleton's house.  Thomas Suppl. Reply Br. at 38–41.  He argues that this shows Jackson acquired the cocaine from Stapleton.  *Id.*  But this evidence, which was available at trial, does not prove that Jackson took the photos himself nor does it contravene the efficacy of defense counsel's cross-examination of Jackson.

claims already addressed above, Thomas Suppl. Reply Br. at 2–26, and raised for the first time two new claims for relief, *id.* at 26–36, 41–46. Thomas filed a motion to add (1) a new claim of prosecutorial misconduct and (2) another ineffective-assistance argument premised on his counsel's alleged failure to identify and correct the prosecutorial misconduct. Thomas Motion to Add Claims, Dkt. No. 393; *see also* Thomas Suppl. Reply Br. at 44 n.8.

Thomas argues that the Government's geolocation evidence derived from the Stingray search shows Jackson was not at Paradise Waste but instead at a nearby business approximately a quarter mile away. Thomas Suppl. Reply Br. at 32–34. He contends that the U.S. Attorney Office's employee that prepared the Government's exhibit used the incorrect GPS coordinates for Paradise Waste, producing an inaccurate exhibit. *Id.* at 33; *see* Attach. 10 (GX 503-J). Thomas claims that this demonstrates he "never had a clandestine after hours night meeting" with Jackson and is "an innocent man." *Id.* at 36.

The Court concludes that this claim does not provide Thomas relief.

a. Thomas's new arguments raised in his reply briefs were waived

The Court concludes that the new arguments Thomas raised in his reply brief are waived. As the Court previously informed Thomas, the Court "ordinarily will not consider issues raised for the first time in a reply brief." *McBride*, 583 F.3d at 96. "This rule applies even when the moving party is pro se." *Farmer v. United States*, No. 12-CR-758 (AJN), 2017 WL 3448014, at *3 (S.D.N.Y. Aug. 10, 2017) (collecting cases).

Thomas argues that the new ineffective-assistance argument was "newly discovered" on the basis of evidence produced by the Government after he filed his initial motion. Thomas Motion to Add Claims at 6. But all the materials that Thomas cites in support of his new ineffective-assistance claim were available at the time he filed his § 2255 motion. The Court

denied Thomas's request for discovery. Dkt. No. 362. Thomas's counsel sent his trial records to Thomas at his request. Dkt. No. 343. When Thomas had difficulty reviewing those electronic files, the Court ordered the Government to mail hard copies of the documents to Thomas. Dkt. No. 378. Because these materials were available even before Thomas's trial and conviction by a jury, they cannot justify his new ineffective-assistance arguments on reply and the Court deems them waived. *See Farmer v. United States*, No. 12-CR-758 (AJN), 2016 WL 1276461, at *2 n.1 (S.D.N.Y. Mar. 30, 2016).

Thomas also argues that his new arguments should be considered because it would not prejudice the Government to do so. Thomas Second Sur-Reply Br. at 2. But the Government need not demonstrate prejudice to convince the Court to follow the standard waiver rule.

The Court therefore concludes that Thomas's arguments raised for the first time in his reply briefs were waived.

b. Thomas's new prosecutorial-misconduct claim is untimely and procedurally defaulted

Nor does the Court decide Thomas's new prosecutorial-misconduct claim on the merits.[16] Because Thomas seeks to make this claim more than one year after his judgment of conviction became final, he would ordinarily be time-barred from filing the claim. 28 U.S.C. § 2255(f)(1).[17] But when a petitioner seeks to add a claim to a pending § 2255 motion, the motion to amend is

---

[16] Even if the Court did reach the merits of Thomas's new claims, it would, for the reasons it rejects Thomas's actual-innocence argument, conclude that the Government's actions did not constitute misconduct because Thomas has not shown a "prosecutor knowingly uses false testimony or false evidence at trial," nor "any reasonable likelihood that the false [evidence] could have affected the judgment of the jury." *Rankins v. United States*, No. 09 CIV. 2181 KMW, 2013 WL 978921, at *6 (S.D.N.Y. Mar. 12, 2013) (quoting *United States v. Helmsley*, 985 F.2d 1202, 1205 (2d Cir. 1993)). The Court would therefore additionally conclude that Thomas's counsel acted reasonably and that no deficiency prejudiced Thomas.

[17] Thomas's claim is untimely because his judgment of conviction became final one year after the Supreme Court denied his petition for a writ of certiorari on October 9, 2018. *United States v. Leon*, 203 F.3d 162, 163 (2d Cir. 2000).

governed by Federal Rule of Civil Procedure 15. *Ching v. United State*s, 298 F.3d 174, 177 (2d Cir. 2002) (Sotomayor, J.) (citing *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 815 (2d Cir. 2000)). To add a time-barred claim, as Thomas requests, the claim must "'relate[] back' to the original habeas motion." *Id.* (quoting Fed. R. Civ. P. 15(c)(2)). "An amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix*, 545 U.S. 644, 650 (2005)

The prosecutorial-misconduct claim does not relate back to Thomas's original motion. Thomas alleges that a paralegal intern in the U.S. Attorney's Office falsified an exhibit to show that Jackson's GPS location was at Thomas's Paradise Waste when he was in fact at a different business a quarter mile away. Thomas Suppl. Reply Br. at 32–36. That claim involves facts that are of a different time and type than any claims that Thomas raised in his initial motion, which did not raise a claim that the Government's GPS location evidence was materially inaccurate. Moreover, "the essential predicate" for Thomas's prosecutorial-misconduct claim was an "extrajudicial event," namely, the creation of the exhibit by the paralegal, and so involves the conduct of a different individual at a different time than the claims Thomas raised in his initial motion. *Mayle*, 545 U.S. at 661. The Court therefore denies Thomas's motion to add claims under Federal Rule of Civil Procedure 15.

Independently, the Court may not consider Thomas's prosecutorial-misconduct claim because it is procedurally defaulted. "In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal." *United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011). "An exception applies, however, if the defendant establishes (1) cause for the procedural default and ensuing prejudice or (2) actual

innocence." *Id.* Thomas's other claims overcome this hurdle because ineffective assistance, if meritorious, "is cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). As to his prosecutorial-misconduct claim, Thomas asserts that "he is actually innocent of the conspiracy charge against him." Thomas Motion to Add Claims at 3 (citing *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (holding "that actual innocence, if proved, serves as a gateway through which a petitioner may pass").

Satisfying the actual-innocence exception requires a higher showing of proof than the *Strickland* prejudice prong. *Rivas v. Fischer*, 687 F.3d 514, 541 (2d Cir. 2012). Thomas's "claim of actual innocence must be both 'credible' and 'compelling.'" *Id.* "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). And to be compelling, the claim must show that "more likely than not any reasonable juror would have reasonable doubt." *House v. Bell*, 547 U.S. 518, 538 (2006). Finally, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

Taking Thomas's representations as true, his prosecutorial-misconduct claim does not satisfy that demanding standard. First, the discrepancy that Thomas identifies is small, and hardly visible on the scale of the Government exhibit shown at trial. Thomas Suppl. Reply Br., Attach. 10 (GX 503-J). The difference is apparent only on Thomas's own map, which uses a different scale than the jury was shown. *Id.*, Attach. 13 at 2, 4. Tellingly, even Thomas, who owned and operated Paradise Waste, apparently did not notice the error at trial, even as he identified other objections to the Government's exhibit. *See* Thomas Petition at 5h. Second, the

difference in locations is well within the margin of error for the geolocation evidence that the Government submitted. Thomas Suppl. Reply Br., Attach. 12 at 3 (GX 1102); *see also* Tr. 1361–62 (presenting this exhibit to the jury). Such a difference is not a material falsehood, let alone proof of Thomas's actual innocence. *Cf. United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001) ("Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury.").[18]

And third, the Court does not find that "in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *House*, 547 U.S. at 538. As explained, the Government introduced a wide variety of witness testimony, phone recordings, and physical evidence that inculpated Thomas. Identifying an error in one government exhibit does not erase the volume of evidence arrayed against Thomas. Notably, Thomas describes the evidence's impact only as "lend[ing] favorably to his trial theory that Jackson was actually involved" with other individuals such that "the result of Thomas's trial may have been different." Thomas Motion to Add Claims at 5–6.

The Court therefore concludes that Thomas has not made a showing of actual innocence necessary to overcome his default. Accordingly, it will not resolve Thomas's prosecutorial-misconduct claim on the merits.

---

[18] Thomas in his second and third reply briefs also refers to the Government' exhibit showing that the shipping container arrived at Paradise Waste on September 5, 2012, and left on September 7. Thomas Suppl. Reply Br. at 29, Attach. 7 (GX 402-A). He argues, therefore, that he and Jackson could not have loaded cocaine into the container on August 31, 2012. Thomas Second Sur-Reply Br. at 6. This argument, which concerns only evidence available at trial, cannot be raised for the first time in reply. More importantly, defense counsel raised this precise point in cross-examination of the Government's paralegal witness. Tr. 1380–81. The Government did not downplay but emphasized these dates in its summation, Tr. 1829, 1959, and defense counsel argued the dates in Jackson's testimony did not add up and should not be believed, Tr. 1923 ("That is a lie. It never happened.").

## IV.     Conclusion

For the reasons provided, the Court denies the motions to vacate under 28 U.S.C. § 2255 filed by Parrilla, Tang Yuk, and Thomas.

No evidentiary hearing is necessary because the files and records of the case conclusively show that Petitioners are not entitled to relief. 28 U.S.C. § 2255(b); *see Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009). Because Petitioners have not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253. Additionally, this Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, so *in forma pauperis* status is denied. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

In case 13-CR-360, this resolves docket numbers 318, 319, 323, 332, 333, 336, 366, 386, 393, and 398. In case 19-CV-9756, this resolves docket numbers 10, 14, 40, and 58. The Clerk of Court is respectfully directed to close the cases in 19-CV-09275, 19-CV-09416, and 19-CV-09756.

The Clerk's office is further respectfully asked to mail a copy of this Opinion and Order to Petitioners Parrilla, Tang Yuk, and Thomas and note the mailing on the public docket.


SO ORDERED.


Dated: September 7, 2021
         New York, New York                    _____
                                                        ALISON J. NATHAN
                                                     United States District Judge